UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
FAIR HOUSING JUSTICE CENTER, INC., et al.,

                                   Plaintiffs,        10 Civ. 912 (RPP)

         - against -                **OPINION AND ORDER**

SILVER BEACH GARDENS CORPORATION, et al.,

                                   Defendants.
------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.:**

       Defendant Silver Beach Gardens Corporation ("Silver Beach") moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss for Plaintiffs' failure to state a claim upon which relief may be granted. Defendant Edgewater Park Owners Cooperative, Inc. ("Edgewater") (together with Silver Beach, "Defendants" or the "Co-Ops") moves to dismiss for want of standing and to strike portions of the complaint pursuant to Fed. R. Civ. P. 12(f). For the reasons stated below, Defendants' motions are denied.

## I. FACTUAL BACKGROUND

       On February 4, 2010, Fair Housing Justice Center, Inc. ("Plaintiff") filed a Complaint with this Court alleging that Silver Beach, Edgewater, and real estate agent Amelia Lewis violated federal, state, and local fair housing laws by selectively enforcing a requirement that purchasers obtain three references from existing Co-op shareholders.[1] (Complaint dated February 4, 2010 ("Compl.") ¶ 12.) Plaintiff is a non-profit organization "dedicated to ensuring

---

[1] Defendant Amelia Lewis, doing business as Amelia Lewis Real Estate, did not make a motion pursuant to Federal Rule of Civil Procedure 12 and instead filed an Answer, Crossclaims and Counterclaims on March 10, 2010. Therefore this opinion does not address any claims or defenses by Ms. Lewis and references to "Defendants" refer solely to the Co-Ops.

1

that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities." (Compl. ¶ 7.) One of the ways Plaintiff assesses compliance with fair housing laws is by hiring testers of different races to pose as potential renters or homebuyers and then sending them to the target entity to inquire about the process of renting or buying a home. (See id. ¶¶ 2, 3, 8, 9, 19.)

In this case, Plaintiff sent two groups of testers, one white and one African American,[2] to meet with Amelia Lewis. (Id. ¶¶ 23, 28.) Lewis is a white real estate broker with multiple listings in the Co-ops who has sold homes within the Co-ops as her primary real estate business for approximately 45 years. (Id. ¶¶ 12, 24, 30.) Additionally, Lewis has previously resided in each of the Co-ops. (Id. ¶ 12.)

**The White Housing Testers**

On September 18, 2009, one of the white testers, posing as a married woman with no children, met with Lewis. (Id. ¶ 23.) Lewis informed the white tester that she would arrange for her to see five houses in Edgewater and one in Silver Beach, all at prices below $300,000. (Id. ¶ 24.)[3] Lewis told the white tester that the Co-ops were "very nice . . . mostly ethnic Irish, German, Italian . . . there's some Puerto Rican, not many" and that "they would love you, I can tell." (Id. ¶ 25.)[4] When the white tester informed Lewis that she did not know anyone in the Co-ops and inquired about the reference policy, Lewis downplayed its importance, characterizing the Co-ops' reference policies as technicalities that she would help them satisfy. (Id. ¶¶ 24, 27, 37.)

---

[2] The two African American testers, Justin Carter and Lisa Darden, are named Plaintiffs in this action but they only assert claims against Amelia Lewis individually and not against the Co-ops. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss, Sever and Strike Portions of the Complaint ("Pl. Mem.") at 4-5.) Because Ms. Lewis does not join in the instant motions and Plaintiffs Carter and Darden are not parties to the motions, the references to "Plaintiff" in this opinion refer solely to the Fair Housing Justice Center, Inc.

[3] On the same day, Lewis' husband showed the white tester a total of eight homes in Edgewater and one in Silver Beach, as well as various communal areas and amenities at the Co-ops. (Compl. ¶ 26.)

[4] Unless otherwise noted, ellipses in direct quotes from the Complaint appear in the Complaint.

When the white testers, on different occasions, asked Lewis about the reference policy, Lewis informed them that they "did not need to know anyone" (id. ¶ 24), that Lewis "was sure she could get references for the tester" (id.), that the seller was "allowed to recommend people to provide references" (id.), that Lewis would "'ask the owner of the house to please help you' with the references" (id. ¶ 27), that "the Co-ops know this is what happens" (id.) and that the seller of a house "did not have to personally meet the testers in order to be one of their references" (id. ¶ 37).

On October 2, 2009, two weeks after initially meeting with Lewis, the white tester returned with a second white tester posing as her husband. (Id. ¶ 34.) After viewing a house in Silver Beach, the white testers met a man named George who told them that he had lived in Silver Beach for eighteen years and that Silver Beach "[is] a nice place to live and that the owners 'like to keep to ourselves about it.'" (Id. ¶ 36.) Three days later, on October 5, 2009, the white testers met with two individuals at the business offices of Silver Beach. (Id. ¶ 39.) When the white testers informed the Silver Beach employees that they did not know anyone in Silver Beach, that Lewis had offered to help with the references and that the seller could be one of the references, the employees responded "don't tell me that . . . I don't want to know that" and "don't tell me . . . you have to have three references; that is our rule." (Id.) When one of the white testers pressed one of the Silver Beach employees about the issue and told her that Lewis had told them it shouldn't be a problem that they did not know anyone, the Silver Beach employee "indicated that it was up to Defendant Lewis if she wanted to do anything" and stated "we shouldn't . . . you need the three letters, but what I don't know, can't hurt me." (Id.)

3

**<u>The African American Housing Testers</u>**

On September 29, 2009, the African American testers met with Lewis after inquiring about a home in Silver Beach priced at or below $300,000.  (Id. ¶ 28.)  Prior to the meeting, Lewis had told one of the testers that she had one home available for $250,000 in Silver Beach. (Id.)  Upon meeting the African American testers, Lewis informed them that they "have to know three people who live there" and after the testers informed Lewis they did not know anyone in Silver Beach, Lewis stated "there's no way you're going to get in there."  (Id. ¶ 29.)  After telling Lewis that they had read about the Co-ops in the newspaper and they seemed like wonderful communities, Lewis replied that "it's not wonderful for everybody," that "it's just . . . mostly Irish … and mostly Italian . . . very few people of any kind of, you know, ethnic color," that "they're very . . . kind of prejudice," that the African American testers "wouldn't be happy there," that "it's like Archie Bunker territory" (id. ¶ 30), and told the African American testers about an incident 15-20 years ago where a cross was burned in the yard of a house just outside of Edgewater (id. ¶ 31).

Citing the reference policy as a categorical bar, Lewis refused to show the African American testers any homes for sale in either one of the Co-ops.  (Id. ¶¶ 29, 32, 33, 38.)  Instead, Lewis instructed her husband to show the African American testers a home in a racially mixed area of the Bronx that was, according to Lewis "two blocks from the projects" and was priced above the testers' stated price range.  (Id. ¶ 32.)

## II.  DISCUSSION

Silver Beach moves to dismiss for failure to state a claim pursuant to Rule12(b)(6) of the Federal Rules of Civil Procedure, arguing that:  (i) the Complaint fails to allege a principal-agent

4

relationship between Silver Beach and Amelia Lewis and Silver Beach therefore cannot be held responsible for the alleged actions and statements of Amelia Lewis; (ii) Silver Beach did not know the racial identity of the African American testers (nor did it have any contact with the African American testers); and (iii) Silver Beach did not receive or deny an application for housing from any tester and the Complaint fails to allege that the African American testers were qualified to purchase a home in Silver Beach.  (Silver Beach's Memorandum of Law in Support of its Motion to Dismiss ("Silver Beach Mem.") at 8-9, 11-14.)  Edgewater argues that Plaintiff fails adequately to allege either direct standing or organizational standing against Defendant Edgewater.  (Edgewater's Memorandum of Law in Support of Motion ("Edgewater Mem.") at 4-5.)  Additionally, Edgewater argues that portions of the complaint are scandalous and moves to strike such portions pursuant to Fed. R. Civ. P. 12(f).  (Edgewater Mem. at 10-14.)

**A.  Silver Beach's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)**

Each of Silver Beach's specific arguments in support of its motion to dismiss rests on the broader premise that Silver Beach had no direct contact with the African American testers and therefore, Plaintiff seeks to hold Silver Beach liable solely based on the statements and actions of Amelia Lewis.  In reliance on this premise, Silver Beach devotes large portions of its briefs to arguing that it is improper to hold Silver Beach liable for the actions and statements of an independent, unaffiliated individual co-Defendant.  (See Silver Beach Mem. at 7-11; Silver Beach Reply Memorandum of Law in Further Support of its Motion to Dismiss ("Silver Beach Reply Mem.") at 1-3.)  This argument fundamentally mischaracterizes Plaintiff's claims.  As Plaintiff made clear in its opposition brief and at oral argument, Plaintiff does not seek to hold Silver Beach liable based on the statements and actions of Lewis, but argues that the Co-op's

three reference policy *itself* violates the Fair Housing Act, as well as other federal, state and city laws, under a number of theories of liability.  (Pl. Mem. at 7-9; Transcript of June 24, 2010 Oral Argument ("Tr.") at 26.)  This action is based upon the processes of 42 USC § 3613, which permit an aggrieved person to commence a civil action in this Court for an alleged discriminatory housing practice, as defined in 42 U.S.C. § 3602. (Compl. ¶ 18.)

Plaintiff submits that the statements and actions of Lewis are not, in and of themselves, a basis for liability on the part of the Co-ops, but would be relevant and admissible evidence on the issue of the actual purpose and effect of the three reference policies of both Silver Beach and Edgewater.  (Pl. Mem. at 8.)  Because Silver Beach largely mischaracterizes the nature of the claims that Plaintiff asserts against it, many of its arguments in favor of dismissal are without merit.  Nevertheless, Silver Beach's specific arguments that Plaintiff fails to state a claim are addressed below in turn.

   1.   Fair Housing Act Racial Discrimination Claims
       a.   Intentional Discrimination

The statements attributed to Defendant Lewis in the Complaint indicate that the Silver Beach and Edgewater Co-ops, for many years, have had very few or no African American members.  Furthermore, Silver Beach and Edgewater do not deny that three reference policy is a policy of the Co-ops.

Silver Beach argues that Plaintiff fails to allege sufficient facts to support its allegation of intentional race discrimination because there is no allegation Silver Beach was aware of the racial identity of the African American testers and because the alleged actions and statements by

Amelia Lewis are not attributable to Silver Beach. (Silver Beach Mem. at 11-13; Silver Beach Reply Mem. at 3-4, 7-8.)

As noted above, this argument appears to rest on the incorrect assumption that the African American testers themselves are asserting claims against Silver Beach or that Plaintiff bases its allegations against Silver Beach on actions taken by Silver Beach against the African American testers personally. However all claims against Silver Beach and Edgewater are brought by Plaintiff Fair Housing Justice Center ("FHJC"), not by Plaintiffs Carter and Darden, who only assert claims against Defendant Lewis.

Plaintiff FHJC's claim for intentional race discrimination – as is the case with all Plaintiff FHJC's claims against the Co-ops – is based on the three reference policy itself, and its enforcement, with accommodations for white prospective buyers and none for African American prospective buyers. (Compl. ¶ 42; see also Pl. Mem. at 7 ("the reference policy enables both cooperatives to maintain themselves as white enclaves").)

The various statements in the Complaint attributed to Amelia Lewis concerning the Co-ops' policies and practices represent allegations which, if true, would support a claim for an intentional discriminatory housing practice in violation of § 3604. Lewis's statement to the white tester that the white tester could fulfill the reference requirement without knowing anyone at Silver Beach and that "the Co-ops know this is what happens" (Compl. ¶ 27) is inconsistent with Lewis's statement to the African American testers that "'you have to know three people who live [in Silver Beach] '" and that "'you really can't do it if you don't have three references' from people who currently live there" (id. ¶ 29). In light of Lewis' comments about the ethnicity and attitudes of the residents (see id. ¶¶ 30-31), the discrepancy between Lewis's statements to the two groups of prospective buyers regarding the three reference policy supports the

Complaint's allegation that the policy is selectively enforced and the enforcement of the policy is based, at least in part, on race.

The statements by Silver Beach's office staff further support Plaintiff's allegation that the three reference policy is selectively enforced. When the Silver Beach employees were informed by the white testers that they did not know any Silver Beach residents, the employees' responses "don't tell me that . . . I don't want to know that" and "what I don't know, can't hurt me" (id. ¶ 39) demonstrate that the Silver Beach employees were aware that certain prospective buyers were allowed concessions and accommodations in connection with the three reference policy and that the employees acquiesced in this practice or, at a minimum, the employees' comments show that they were being willfully blind to the selective enforcement of the three reference policy.

In view of these statements, the Complaint states a claim against Defendant Silver Beach under a theory of intentional discrimination in housing practices as defined by 42 U.S.C. § 3613 and § 3602.

      b. Disparate Impact

Silver Beach argues that Plaintiff's claim alleging disparate impact must be dismissed because "the African American testers never visited the Silver Beach business office and never spoke to any Silver Beach representative at any time" and because the Complaint "fail[s] to allege that the African American testers were treated in any disparate fashion by the Silver Beach business office." (Silver Beach Mem. at 15.) Once again, Silver Beach's argument mistakenly assumes that it is the individual African American testers who bring the disparate impact claim against Silver Beach. Also, without citing to case law supporting its position, Silver Beach assumes that in order to state a disparate impact claim, the Plaintiff must plead facts showing that a particular individual tester received disparate treatment at the hands of Silver Beach.

In the Second Circuit, in order to prove a housing discrimination claim based on a theory of disparate impact, a plaintiff must establish that a facially neutral practice or policy "actually or predictably results in . . . discrimination; in other words that it has a discriminatory effect" on a protected class of persons.  Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934, 939 (2d Cir. 1988) (citations omitted).  See also id. (stating that once a plaintiff has made a showing of discriminatory effect, a defendant must then present a "legitimate justification[ ] for its action with no less discriminatory alternatives available.").

Policies similar to the ones adopted by Defendants have been held to have an illegal disparate impact.  The Second Circuit has held that, "in order to prove a prima facie case of race discrimination plaintiffs needed to show only that the action complained of had a racially discriminatory effect; they were not required to show that Defendants acted with racially discriminatory motivation."  Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1036 (2d Cir. 1979).  See also Huertas v. E. River Hous. Corp., 674 F. Supp. 440, 453 (S.D.N.Y. 1987).   Here, Plaintiff FHJC alleges a discriminatory effect through statistical data tending to show that the reference policies serve to exclude African American homebuyers from Co-ops in the Bronx, in which 35% of owner-occupied homes are owned by African Americans, by requiring three references from residents residing in the Bronx within two nearly all-white communities.  (Compl. ¶¶ 14, 43.)

2.  Plaintiff's Clams under § 3604(a) of the Fair Housing Act

Defendant Silver Beach urges that without an actual application from one of the testers, Plaintiff cannot prove that Edgewater's alleged actions caused Plaintiff's injuries.  (Tr. at 37-38.)  Silver Beach cites an unreported decision from the Western District of New York for the

proposition that in order to state a claim under Section 3604(a) of the Fair Housing Act, plaintiffs must actually apply to purchase a home. United States v. Town Hall Terrace Assoc., 1997 U.S. Dist. LEXIS 3119 (W.D.N.Y. 1997). Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added). Plaintiff FHJC is asserting that Defendants' practices are making housing unavailable to African Americans. In United States v. Youritan Constr. Co., 370 F.Supp. 643, 650 (N.D. Cal. 1973), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975) the court pointed out that "[t]he sentence is so constructed that the 'bona fide offer' requirement grammatically applies only to refusals to rent [or sell], and not to the remainder of the prohibition," and held that the "imposition of burdensome application procedures…[among] various forms of discouragement…constitutes a violation of Section 3604(a)." See also Kyles v. J.K. Guardian Security Servs., 222 F.3d 289, 300 n.7 (7th Cir. 2000) ("The ban on refusals to sell or rent on the basis or race, etc. is the only clause of [§ 3604(a)] that includes the bona fide offer requirement. Consequently, the other activities addressed by subsection (a). . . are prohibited irrespective of whether there was a bona fide offer").

      The Second Circuit did not impose the "bona fide offer" requirement for claims brought pursuant to Section 3604(a) in United States v. Yonkers Board of Education, 837 F.2d 1181 (2d Cir. 1987) ("bona fide offer" not necessary to prove that city intentionally segregated public housing which led to illegally segregated public schools). Likewise, the testers did not need actual contact with Defendants to allege discrimination in the terms and conditions of housing (the reference policies) in violation of 42 U.S.C. § 3604(b). Additionally, none of the testers in

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898 (2d Cir. 1993) or Cabrera v. Jakabovitz, 24 F.3d 372, 379 (2d Cir. 1994) even submitted an application for housing.  The courts granted injunctive relief and damages for the organizational claimants in those cases, despite the fact that the plaintiffs never applied for housing.  The lack of an application by the testers does not bar Plaintiff FHJC's claim of a violation under the second clause of 42 U.S.C. § 3604(a).

### 3. Plaintiff's Claims Under Section 1982 and State and Local Law

Silver Beach argues that Plaintiff's claims based on 42 U.S.C. § 1982 and based on various state and local housing laws should be dismissed, asserting the same arguments it makes with respect to the Fair Housing Act claims.  The Second Circuit recognized the right of fair housing organizations to assert claims of race discrimination pursuant to §1982.  Cabrera, 24 F.3d at 379.  Because Plaintiffs have stated a claim for housing discrimination under either a theory of intentional race discrimination or a theory of disparate impact, as discussed *supra*, its race discrimination claim under § 1982 survives Silver Beach's motion to dismiss.

Supplemental jurisdiction over the claims brought under state and local laws is appropriate.  A court has supplemental jurisdiction over a claim where it is "so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Here, all claims share a common nucleus of facts and arise out of the same series of transactions or occurrences.  See United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).  Exercising supplemental jurisdiction in this case is appropriate because it affords this Court the opportunity to fully adjudicate and rule on the entire controversy, and the interests of fairness, justice, and

11

judicial economy demand that Plaintiff be allowed to bring its state law and local law claims in this action because such claims are based on the same facts and are nearly identical to its claims under federal law.

**B. <u>Edgewater's Motion to Dismiss for Lack of Standing</u>**

The Supreme Court has held that that fair housing organizations have standing to sue under the Fair Housing Act. <u>Havens</u>, 455 U.S. at 379, n.19 ("We have previously recognized that organizations are entitled to sue on their own behalf for injuries they have sustained."). The constitutional requirements for organizational standing are injury in fact, causation, and redressability. <u>Spann v. Colonial Village, Inc.</u>, 899 F.2d 24, 27 (D.C. Cir. 1990) ("The organization must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.").

First, Edgewater's contention that Plaintiff fails to establish an injury in fact is without merit. In <u>Havens Realty</u>, a fair housing organization alleged that the owner of an apartment complex engaged in racial steering practices that perceptibly harmed the organization's mission of protecting the interests of low and moderate-income homeseekers. <u>Havens</u>, 455 U.S. at 379. The Supreme Court found that where these allegations are made by such an organization "there can be no question that the organization has suffered injury in fact" and that "[s]uch concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than…a setback to…abstract social interests." <u>Id.</u> Additionally, in <u>Ragin</u>, 6 F.3d at 905, the Second Circuit affirmed several lower court rulings in favor of Open Housing Center, a New York City-based fair housing organization, which had

asserted organizational standing based on resources it diverted to conduct investigations of Defendant's discriminatory housing practices.

In the instant case, Plaintiff sufficiently alleges an injury in fact. Plaintiff alleges that it "has suffered injury in the form of a diversion of its resources and frustration of its mission, including staff time expended to respond to Defendants' discriminatory conduct." (Compl. ¶ 44.) The diversion of Plaintiff's resources and frustration of Plaintiff's mission is the type of injury held to be sufficient by the Supreme Court and the Second Circuit to demonstrate the injury in fact element of organizational standing.

Second, Edgewater's contention that Plaintiffs failed to trace the injury to the alleged illegal conduct is without merit. During argument, Edgewater claims "no case was cited by Plaintiffs in their briefs or in their reply…where an applicant has failed to actually test the actual entity that is being sued…and have standing." (Tr. at 21-22.) Yet, Plaintiffs cite Cabrera which affirmed a jury verdict under the Fair Housing Act and the Civil Rights Act of 1866 for a New York City-based fair housing organization. (Plaintiff's Memo. at 6.) Based on Plaintiff's having conducted a similar test to the one here, the Second Circuit held that the organization had standing to sue even where the organization and testers lacked contact with all named Defendants. Cabrera, 24 F.3d at 379. Edgewater argues that Cabrera is distinguishable from the instant case because testers in that case provided income information to show that they could afford to purchase the homes. Id. (Tr. at 40-41.) The Court in Cabrera did not rely on the provision of income information in holding that the evidence of discriminatory housing practices established by the testing organization was sufficient to impose liability. Plaintiff also relies on Ragin, 6 F.3d at 901-902, where testers read advertisements in the newspaper that used white models. (Plaintiff's Memo. at 5.) A fair housing organization filed a claim against the real estate

company who placed the ad.  Ragin, 6 F.3d 898.  Neither the testers nor the housing organization in that case ever had any contact with the real estate company beyond reading its advertisements in the newspaper.  Id.

In the instant case, Plaintiff sufficiently alleges the causation prong of organizational standing even though the testers submitted no applications for housing with either Co-op and had no personal contact with Edgewater.  Causation is satisfied by alleging, as Plaintiffs have done, that Defendants' actions and reference policies "constitute[] otherwise making unavailable or denying a dwelling to any person, in terms conditions, or privileges of sale or lease of a dwelling because of race or color, in violation of…the Fair Housing Act, 42 U.S.C. 3604(a)" and "constitute[] discrimination against any person in the terms, conditions, or privileges of sale or lease of a dwelling because of race or color, in violation…of the Fair Housing Act, 42 U.S.C. 3604(b)."  (Compl. ¶¶ 84, 85.)  See Robinson, 610 F.2d at 1036.

Third, Edgewater contends that Plaintiff fails to satisfy the redressability prong of organizational standing.  See generally Lujan v. Defenders of Wildlife, 112. S. Ct. 2130, 2137.  It insists that the actions and comments of Defendant Amelia Lewis cannot be imputed to it, and that therefore a finding against Edgewater would not redress any grievance caused by Ms. Lewis.  (Edgewater Reply at 3; Tr. at 19, 20, 24.)  Edgewater argues that "[w]hat *is* relevant is what *Ms. Amelia Lewis* did…" to support its contention that a favorable court ruling for Plaintiffs would only remove the neutral reference policies but would do nothing to redress the allegedly discriminatory acts by Amelia Lewis, whom it argues caused Plaintiff's injury and is in violation of the law.  (Tr. at 23) (emphasis added).  Plaintiff makes clear that this action targets the injuries caused by the policies of the Co-ops and that Plaintiffs pleaded Lewis's comments for the purpose of including her, not only as an aider and abettor, but as a fact witness.  Plaintiffs assert

14

that Ms. Lewis possesses knowledge of the Co-ops's policies, their application and their impact from 45 years of experience selling real estate and residing within the Co-ops and pleaded her statement not as "a party admission towards the co-ops," but as evidence. (Plaintiff's Memo. at 7-8; Tr. at 31-32.)  Contrary to Edgewater's assertions, Plaintiffs are seeking injunctive relief preventing defendants from enforcing any requirement that a prospective purchaser must offer a minimum number of reference letters from current residents as a pre-condition of purchasing a home in Silver Beach or Edgewater.  (Compl. p. 22.)  Plaintiffs also seek compensatory damages for the resources they have devoted to investigating Silver Beach and Edgewater's housing practices. (Compl. p. 23).  Thus, a favorable ruling for Plaintiffs would prevent Lewis and all individuals similarly situated from assisting some prospective buyers in satisfying the reference policy while citing it as a barrier for others.  Moreover, a favorable ruling would properly redress the source of Plaintiff FHJC's injury.

      The Court therefore finds that Plaintiff has established an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision and has organizational standing to sue Defendants in its own right.

### C. Edgewater's Motion to Strike Pursuant to Fed. R. Civ. P. 12(f)

      Courts have considerable discretion in considering motions to strike. Pigford v. Veneman, 215 F.R.D. 2 (D.D.C. 2003).  However, such motions are generally disfavored by the courts. Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).  In a motion to strike pleadings, a moving party must show that (1) no evidence in support of the allegation would be admissible; (2) the allegation has no bearing on relevant issues; and (3) allowing the allegation to stand would result in prejudice to the movant. Hargett v. Metro. Transit Auth., 552

F. Supp. 2d 393, 404 (2d Cir. 2008). The statements by Amelia Lewis, residents of Edgewater, and employees of Silver Beach are admissible as probative evidence of the discriminatory purpose, intent, and impact of the reference policy. These statements provide support for Plaintiff's central allegation; namely, that the policy has a discriminatory purpose and/or a disparate impact and that Defendants, by bringing the policy into existence and selectively enforcing it, engaged in illegal discrimination. The statements do have a unique relevance and connection to the allegations and central issues in this case – discrimination and racial animus – and may not properly be labeled as "scandalous."

## CONCLUSION

For the reasons above, Defendants' motions are denied.[5]

IT IS SO ORDERED.

Dated: New York, New York
August 13, 2010

Robert P. Patterson, Jr.
U.S.D.J.

---

[5] Edgewater also moves to sever pursuant to Fed. R. Civ. P. 21 for misjoinder of parties. At oral argument, the Court denied Edgewater's motion to sever as premature and without prejudice to be raised again in connection with trial. (Tr. at 51).

Copies of this order were faxed to:

Diane Lee Houk / Mariann Meier Wang
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza, 20th Fl.
New York, NY 10019
Fax: (212)-763-5001

Evan Asher Richman
White, Fleischner & Fino, LLP
61 Broadway, 18th Floor
New York, NY 10005
Fax: (212) 487-9777

Richard P. Marin
Marin Goodman LLP
500 Mamaroneck Ave, Suite 501
Harrison, NY 10528
Fax: (212)-661-1141

Howard Scott Levine
Rappaport, Hertz, Cherson & Rosenthal, PC.
118-35 Queens Blvd
Forest Hills, NY 11375
Fax: 718-261-7336