UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
FAIR HOUSING JUSTICE CENTER, Inc.,
JUSTIN CARTER, and LISA DARDEN,

                    Plaintiff,                10 CV 912 (RPP)

    - against -

                                  **OPINION AND ORDER**

EDGEWATER PARK OWNERS
COOPERATIVE, Inc.

                 Defendants.
---------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

## I.    Introduction

On February 4, 2010, Plaintiff Fair Housing Justice Center ("FHJC" or "Plaintiff"), along with Justin Carter ("Carter") and Lisa Darden ("Darden"), filed a complaint against Defendant Silver Beach Gardens Cooperative ("Silver Beach"), Edgewater Park Owners Cooperative, Inc. ("Edgewater Park" or "Defendant") and Amelia Lewis ("Ms. Lewis"), alleging violations of (1) the Civil Rights Act of 1866, 42 U.S.C. § 1982 (2) the Fair Housing Act ("FHA"), 42 U.S.C § 3604 (3) New York State Human Rights Law and New York State Civil Rights Law and (4) New York City Human Rights Law by selectively enforcing a requirement that purchasers obtain three references from existing Cooperative ("Co-op") shareholders as a pre-requisite to buying shares of the Co-op.  On August 13, 2010  the Court denied Defendants' motion to dismiss.  Fair Hous. Justice Ctr, Inc. v. Silver Beach Gardens Corp., No. 10 Civ 912 (RPP), 2010 WL 3341907 (S.D.N.Y. Aug. 13, 2010).  On March 22, 2011, FHJC reached a settlement agreement with Ms. Lewis. (Settlement Agreement and Order dated March 22, 2011, ECF No. 55.)  On May 17,

2011, FHJC reached a settlement agreement with Silver Beach.[1] (Settlement Agreement and Order dated May 17, 2011, ECF No. 60.)  On September 23, 2011, Edgewater moved for summary judgment.  On November 1, 2011, Plaintiffs submitted a memorandum in opposition to Defendant's motion, and on November 18, 2011, Defendant submitted a reply memorandum. Oral argument on this matter was held on January 3, 2011.  For the following reasons Defendant's motion for summary judgment is denied.

## II.    Facts[2]

### A.    <u>Parties</u>

Plaintiff is a non-profit organization whose mission is to ensure that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities and strengthening.  (Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 1-2.)  One of the ways Plaintiff assesses compliance with fair housing laws is by hiring testers of different races to pose as potential renters or homebuyers and then sending them to the target entity to inquire about the process of renting or buying a home. (Pl.'s 56.1 ¶¶ 5-6.)

Defendant is a Co-op in the Throgs Neck section of the Bronx and consists of 675 single-family unattached homes. (Def's Local Rule 56.1 Statement ("Def.'s 56.1") Ex. F ¶ 3.) Defendant became a Co-op in 1988. (<u>Id.</u> ¶ 2.)  Ms. Lewis was an independent real estate broker who operated a business called "Amelia Lewis Real Estate" that was also located in the Throgs Neck section of the Bronx. (Def's 56.1 ¶ 1.)  Lewis frequently showed homes in Edgewater Park and stated that Edgewater Park made up a large percentage of her real estate business over her 45

---

[1] As a result, Silver Beach and Lewis are no longer parties to the case, and their names have been removed from the caption.
[2] All citations to the parties' Local Rule 56.1 statements are undisputed unless otherwise noted.

year career. (Pl.'s 56.1 ¶ 19.)   Ms. Lewis, however, was not an agent, employee or

representative of Edgewater Park at the time of FHJC's investigation.[3] (Def.'s 56.1 ¶¶ 2-3.)

      **B.**     **The Investigation**

     In August 2009, FHJC began an investigation into Edgewater Park based on an article in

the New York Times which described Edgewater Park and Silver Beach as not "open to just

anyone" and mentioned that prospective buyers were required to obtain three references from

current residents. (Def.'s 56.1 Ex. O at 16; Pl.'s 56.1 ¶ 12.)   Ms. Lewis was one of the real estate

brokers who was referenced in the New York Times article about the two communities. (Pl.'s

56.1 ¶ 13.)  In response to the New York Times article, FHJC decided to send both African-

American and white testers to visit independently with Ms. Lewis to inquire about housing at

Edgewater Park and Silver Beach. (Id. ¶¶ 12-13.)  FHJC sought to determine whether the Co-ops

three reference rule was acting as an obstacle to minority buyers. (Id. ¶ 10.)

      **The White Housing Testers**

     On September 18, 2009, a white tester, posing as a married woman with no children, met

with Ms. Lewis to discuss buying a home. (Declaration of Samuel Shapiro dated October 28,

2011 ("Shapiro Decl.") Ex. 23 at 10.)  Ms. Lewis informed the white tester that she would

arrange for her to see five houses in Edgewater Park and one in Silver Beach, all at prices below

$300,000. (Id. at 10-11.)  On the same day, Ms. Lewis' husband showed the white testers a total

of eight homes in Edgewater Park and one in Silver Beach, as well as various communal areas

and amenities at the Co-ops.  (Id. at 19.)  Ms. Lewis told the white tester that the Co-ops were

"very nice . . . mostly ethnic Irish, German, Italian . . . there's some Puerto Rican, not many" and

---

[3] Ms. Lewis previously lived in Edgewater Park from 1958 until 1972. (Pl.'s 56.1 ¶ 18.)

that "they would love you, I can tell." (Id. at 16.)  When the white tester inquired about the reference policy and informed Ms. Lewis that she did not know any residents of the Co-ops, Ms. Lewis downplayed its importance, characterizing the Co-ops' reference policies as technicalities that she would help satisfy. (Id. at 31.)  Specifically, when the white tester asked Ms. Lewis about the reference policy, Ms. Lewis informed her that it wouldn't be a problem that they were new to the neighborhood, (id. at 31), that she could get references for the tester because sellers were allowed to recommend people to provide references, (id. at 15-16), that she would "ask the owner of the house" to help you with the references, and that "they [the Co-ops] know this is what happens" (id. at 31).

### The African American Housing Testers

On September 29, 2009, the African-American testers, posing as a married couple, met with Ms. Lewis to inquire about homes in Silver Beach (not Edgewater Park) that were priced at or below $300,000.[4] (Def.'s 56.1 Ex. U, V.)  Prior to the meeting, Lewis had told one of the African-American testers over the phone that she had one home available for $250,000 in Silver Beach. (Shapiro Decl. Ex. 18 at 2.)  Upon meeting the African American testers in person, the following conversation ensued:

| | |
|---|---|
| Lisa Darden: | Um, we want to get, um, information about, um, your co-op you were telling me about at . . . |
| Amelia Lewis: | Co-op in Edgewater? |
| Lisa Darden: | In, uh, Silver Beach Gardens . . . |
| Amelia Lewis: | Silver Beach is the same. |

[4] The "tester assignment" document that FHJC prepares for its testers states that "you are very interested in Silver Beach Gardens, but are open to other areas if the agent has suggestions." (Def.'s 56.1 Ex. U.)

Lisa Darden:          Okay, okay.

Amelia Lewis:         You have to know three people who live there.

Lisa Darden:          We don't know anybody that lives there.

Amelia Lewis:         Then, there's no way you're going to get in there.

Lisa Darden:          There's no way?

Amelia Lewis:         No.

Lisa Darden:          You can't . . . we can't even apply?

Amelia Lewis:         No, cause if you don't have three people…I was

                      just going over this stuff with him . . .

Justin Carter:        Hm.

Lisa Darden:          Okay

Amelia Lewis:         If you don't have three people who know you….

Justin Carter:        Mm-hm.

Lisa Darden:          Okay.

Amelia Lewis:         Or say they know you…

Justin Carter:        Yeah.

Amelia Lewis:         And I don't know how you're going to get it….

Lisa Darden:          Yeah.

Amelia Lewis:         Because I can't help with that…

Justin Carter:        Mm-hm

Lisa Darden:          Oh, yeah.

Amelia Lewis:         I tried one time, I…they almost threw me out of the

                      place.

5

| Justin Carter: | Wow. |
|---|---|
| Lisa Darden: | Mm. |
| Amelia Lewis: | (laughs) I got, you know, bad Karma...anyway. |
| Justin Carter: | Hm. |
| Lisa Darden: | (laughs) |
| Justin Carter: | Right. |
| Amelia Lewis: | So, anyway, uh, no you really can't do it if you don't have three references. |
| Lisa Darden: | Okay. |
| Justin Carter: | Okay. |
| Lisa Darden: | Okay. |

(Id. at 6.)

After the African-American testers told Ms. Lewis that they had read about the Co-ops in the newspaper and they seemed like wonderful communities, Ms. Lewis replied that "it's not wonderful for everybody," that "it's just . . . mostly Irish . . . and mostly Italian . . . very few people of any kind of, you know, ethnic color," that "they're very . . . kind of prejudice," that the African-American testers "wouldn't be happy there," and that "it's like Archie Bunker territory." (Id. at 8.)  Ms. Lewis also relayed a story about an incident that took place 15 or 20 years ago where a cross was burned in the yard of a house just outside of Edgewater Park. (Id. at 10.)

Citing the reference policy as a categorical bar, Ms. Lewis refused to show the African American testers any homes for sale in either one of the Co-ops. (Id. at 6.)  Instead, Ms. Lewis instructed her husband to show the African-American testers a home in a racially mixed area of

the Bronx that was, according to Ms. Lewis "two blocks from the projects" and was priced above

the testers' stated price range. (<u>Id.</u> at 13.)

Neither FHJC nor its testers ever spoke with a representative of Edgewater Park, or

appeared at the offices of Edgewater Park with the purpose of submitting a housing application.

(Def.'s 56.1 ¶ 6.)  Additionally, the testers did not attempt to obtain reference letters from any

residents of Edgewater Park. (<u>Id.</u>)

## III.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and the disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   "In ruling

on a motion for summary judgment, the district court is required to resolve all ambiguities, and

credit all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment."  <u>Kessler v. Westchester Cnty Dep't of Soc. Serv.</u>, 461 F.3d 199, 206 (2d

Cir. 2006) (quoting <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)).  The non-moving

party, however, "may not rest upon mere conclusory allegations or denials, but must bring

forward some affirmative indication that his version of relevant events is not fanciful."  <u>Podell v.

Citicorp Diners Club, Inc.</u>, 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations omitted).  "A

dispute about a genuine issue exists for summary judgment purposes where the evidence is such

that a reasonable jury could decide in the non-movant's favor."  <u>Beyer v. Cnty of Nassau</u>, 524

F.3d 160, 163 (2d Cir. 2008).

## IV.    Discussion

Edgewater Park moves for summary judgment arguing that (1) Plaintiff lacks

organizational standing to bring this claim; (2) Plaintiff has not proffered evidence which would

allow a reasonable jury to conclude that Edgewater Park employs the three reference rule with the intent to discriminate against minorities; and (3) that there is no evidence for the fact-finder to conclude that the three reference rule operates with a disparate impact on minorities. (Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 4-12, 12-21, 21-24.)

## A.      <u>Organizational Standing</u>

The Supreme Court has held that fair housing organizations have standing to sue under the Fair Housing Act. <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 n.19 (1982) ("We have previously recognized that organizations are entitled to sue on their own behalf for injuries they have sustained.").  The constitutional requirements for organizational standing are injury in fact, causation, and redressability.  <u>Spann v. Colonial Vill., Inc.</u>, 899 F.2d 24, 27 (D.C. Cir. 1990) ("The organization must show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.").

Plaintiff argues that it has suffered an injury in fact similar to the injury suffered by the fair housing organization in <u>Havens Realty</u>. (<u>See</u> Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 3.)  In <u>Havens Realty</u>, a fair housing organization alleged that the owner of an apartment complex engaged in racial steering practices that perceptibly harmed the organization's mission of protecting the interests of low and moderate-income home seekers. 455 U.S. at 379.  The Supreme Court found that where these allegations are made by such an organization "there can be no question that the organization has suffered injury in fact" and that "[s]uch concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than . . . a setback to . . . abstract social interests." <u>Id.</u>  In granting the fair housing organization standing in <u>Havens Realty</u>, the Court based its conclusion on the allegation pleaded in the complaint that "Plaintiff . . . has been

8

frustrated by defendant's racial steering practices in its effort to [obtain] equal access to housing through counseling and other referral services." Id. at 379.

Additionally, in Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898 (2d Cir. 1993), the Second Circuit affirmed several lower court rulings in favor of Open Housing Center, a New York City-based fair housing organization, which had asserted organizational standing based on resources it diverted to conduct investigations of defendant's discriminatory housing practices. Plaintiff relies on Ragin, a case that involved African-American plaintiffs reading newspaper advertisements, to establish that it suffered an injury in fact. (Pl.'s Mem. at 3 (citing Ragin, 6 F.3d at 905)); Transcript of Oral Argument dated Jan. 3, 2012 ("Tr.") at 39).) Indeed, Ragin confirmed that there need only be a "perceptible impairment" of an organizations activities and resources for there to be an "injury in fact." Id. at 905 (citing Havens Realty, 455 U.S. at 379); see also Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011) (confirming that Ragin is still good law in this circuit). In Ragin, both individual plaintiffs and a fair housing organization filed suit against the defendant real estate company alleging violations of the FHA. 6 F.3d at 901. The court concluded the fair housing organization sufficiently diverted its resources and manpower to investigate the allegedly discriminatory advertisements and granted standing. Plaintiff states that "since the factual record shows Plaintiff has suffered the same injury as in Ragin, and that the injury is redressable by a favorable court decision, Plaintiff has standing to pursue this action." (Pl.'s Mem. at 5.)

In the instant case, Plaintiff has suffered an injury in fact. The diversion of Plaintiff's resources in the investigation into the existence of and justification for the three reference rule is the type of injury held to be sufficient by the Supreme Court in Havens Realty and the Second Circuit in Ragin to demonstrate the injury element of organizational standing. Plaintiffs use of

9

testers expended staff time and resources that could have been used to identify and investigate other potential instances of housing discrimination in the New York metropolitan area.

Plaintiff also points out that the causation prong of organizational standing has been satisfied even though the testers submitted no applications for housing with either Co-op, and had no personal contact with Edgewater Park. (Tr. at 39-40.)  The causation prong of organizational standing would be satisfied if Plaintiff demonstrated that Defendant's reference policy resulted in the unavailability or denial of "a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a).  Defendant argues that Plaintiff relies solely on the assumptions of a real estate agent who is not in an agency relationship with Edgewater Park. (Def.'s 56.1 ¶ 3.)  Defendant contends that the mere mention of a three reference rule and the racial steering of one real estate agent does not provide a fairly traceable linkage to the cause of injury to Defendant, (Tr. at 31-33, 37), and that unlike in Ragin, Ms. Lewis was neither a principal of Edgewater Park nor an agent of Edgewater Park as was the Defendant in Ragin.[5]  Furthermore, Defendant argues that no further investigation was undertaken by the FHJC to contact Edgewater Park to determine how the three reference rule is utilized. (Tr. at 38.)  As such, Defendant contends that Plaintiff has imputed Ms. Lewis' racial rationale for the three reference rule to Edgewater Park without any interaction with Edgewater Park whatsoever.  Plaintiff concedes that there was no interaction between Defendant and the FHJC testers, (Pl.'s Resp. to Def.' 56.1 ("Pl.'s Resp.") ¶ 6), however, it argues that the actions of Ms. Lewis and her reliance on the three reference rule provide enough linkage to fairly trace an

---

[5] As discussed infra, however, the only practical way a member can go about selling their home is by using a real estate agent or by independently finding a buyer without the aid of an open house.  Therefore, it is necessary that brokers have to be aware of the three reference rule and communicate its existence to potential buyers.

injury to Plaintiff to Edgewater Park.   Were it not for the three reference rule policy adopted by Edgewater Park, Ms. Lewis would not have steered the black testers away from Edgewater Park.

Edgewater Park neither directly accepts applications from perspective buyers nor directly shows homes to prospective buyers. (Tr. at 39.)  During the deposition of Majorie Hooks, an administrative assistant in Edgewater Park's office, the following exchange occurred:

| | |
|---|---|
| Question: | Do prospective home buyers ever stop by the Edgewater Park office to get information about the cooperative? |
| Answer: | Yes |
| Question: | Under what circumstances have they done that while you've been working – not while you were on the Board but while you were working in the office? |
| Answer: | They come in and ask if there are any houses for sale.  They ask general questions about the application itself. |
| Question: | Do they ask questions about the community itself, Edgewater Park? |
| Answer: | Sometimes. |
| Question: | When people stop by and ask questions about houses for sale, what is your general practice in responding to that? |
| Answer: | People, these are privately owned homes, people sell them on their own.  We don't know every house that's for sale.  There are some posted on bulletin boards in the office, they deal with local real estate agents.  We have a newsletter that some people advertise in. |

Question:              Do you provide a copy of the Gazette Newsletter to people that
                       inquire?

Answer:                Yes.

(Shapiro Decl. Ex. 3 at 32-33.)  As testified to by Ms. Hooks, individual homeowners sell their

homes on their own, or more commonly, by listing with an real estate agent independent of

Edgewater Park.  While some homes are surrendered back to Edgewater Park for various

reasons, these occurrences are rare. (Tr. at 53.)  The sales of the surrendered homes are only

advertised by Edgewater Park in an internal newspaper and through other internal media. (Id. at

53-54.)

The bottom line is that Edgewater Park is a private community where open houses are

ostensibly not permitted[6] and "for sale" signs are prohibited. (Id. at 44, 62; Shapiro Decl. Ex. 5 at

130.)  Thus, in practice the most common way to purchase real estate at Edgewater Park is

through an independent real estate agent.  Other real estate agents besides Ms. Lewis have

testified that they inform potential buyers about the three reference rule either through personal

interactions or through indications on home listing advertisements. (See Shapiro Decl., Ex.'s 4 at

48-49,  9 at 45, 26.)  Upon learning of the three reference rule from a real estate agent, African-

Americans are unlikely to pursue housing at Edgewater Park because as Plaintiff notes, "[o]ne of

the discriminatory aspects of the Shareholder Reference Rule . . . is that it discourages African-

Americans from even applying for shares at Edgewater Park. (Pl.'s  56.1 Resp. ¶ 9.)  In a FHA

case, there is no requirement that an application be submitted to gain standing. See E.E.O.C. v.

Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus., 164 F.3d 89, 97 (2d Cir. 1998)

---

[6] This fact remains in dispute among various Edgewater board members and employees. (Tr. at 44, 62.)

12

(acknowledging there exists "a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory" and thus no application is filed). The injury suffered by FHJC is fairly traceable to the three reference policy of Edgewater Park. As such, a favorable ruling for Plaintiff would properly redress the source of FHJC's injury.

**B.**     **Plaintiff's Claim For Intentional Discrimination (Disparate Treatment)**

Plaintiff argues that Edgewater Park's three reference rule was "intentionally designed and used to maintain the racial status quo at Edgewater Park." (Pl.'s Mem. at 16.)  Specifically, Plaintiffs contend that the rule acts as a barrier to minority – especially African-American – buyers as the rule is not applied similarly to white prospective buyers as it is to African-American prospective buyers. (Id.)  Plaintiff bases this claim on the statements and actions of Ms. Lewis in her dealings with the white testers as opposed to the black testers.  Defendant, on the contrary, argues that Plaintiff does not provide any facts which demonstrate that the three reference rule is applied with the purpose of excluding African-American buyers from Edgewater Park. (Def.'s Mem. at 1, 7.)

Plaintiff brings its claims under both 42 U.S.C. § 1982 and 42 U.S.C. § 3604(a).[7]  Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (emphasis added).  Similarly, section 1982 provides in relevant part that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42

---

[7] Plaintiff is also pursuing claims under N.Y. Exec. L.§ 296(a)(1) and (3); N.Y. Exec. Law § 40-c; and N.Y.C. Admin. Code § 8-107(5)(a)(1) and (c)(2).

U.S.C. § 1982.  Unlike claims brought under the FHA, section 1982 claims require a showing of discriminatory intent.  See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 388-89 (1982).

To establish a claim under the FHA (and Plaintiff's other intent based claims), Plaintiff must demonstrate that race is a motivating factor in Edgewater Park's three reference policy. See e.g., LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995).  Plaintiff may establish a prima facie case of this discrimination by showing "(1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003) (citing Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir. 1979).  Discriminatory intent can be deduced from the "totality of the circumstances," and courts should consider such factors  as the discriminatory impact of the policy, the historical background of the policy, the event which led up to the challenge of the policy, departures from normal procedures, and departures from normal substantive criteria. Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 580 (2d Cir. 2003) (citing Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 266-68 (1977)).

The Court analyzes intentional discrimination cases brought under the FHA using the burden shifting analysis established by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Cabrera v. Jakabovitz, 24 F.3d 372, 380-84 (2d Cir. 1994).  If a plaintiff is able to make a prima facie case of housing discrimination, the burden then shifts to the defendant to assert a legitimate and non-discriminatory reason why the applicants were denied. See Mitchell, 350 F.3d at 47 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Should the defendant make such a showing, the burden swings back to the plaintiff to demonstrate that

discrimination was indeed at the heart of the defendant's adverse actions. Id.  Plaintiff's initial

burden of proof to demonstrate a prima facie case of discrimination is minimal. See Quaratino v.

Tiffany & Co., 71 F.3d 58, 65-66 (2d Cir. 1995).  As discussed infra, there are triable issues of

fact with respect to Plaintiff's intent-based discrimination claims.

### Sufficiency of the Evidence

Defendant argues that Plaintiff has produced no evidence which would allow the trier of

fact to conclude that Edgewater Park's adoption and application of the three reference rule is

predicated on discrimination. (Def.'s Mem. at 7.)  Defendant posits that "Plaintiff has discovered

no documents . . . no written discovery responses . . . no factual testimony . . . which substantiate

the allegation that the three reference rule was adopted, or has been applied, with discriminatory

intent by Edgewater Park. (Id. at 8-9.)  While Plaintiff has proffered no direct evidence that

racial animus is behind the three reference rule, there is sufficient circumstantial evidence for a

jury to infer that race has played a role in the housing application process at Edgewater Park.  It

is well settled that a plaintiff can prove discrimination through circumstantial evidence alone.

See Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100 (2003).  Indeed, a "smoking gun" is rarely

found where such claims are asserted. See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.

1991).  It is the rare occasion when discrimination boldly smacks one in the face, rather, it is

"often accomplished by discreet manipulations and hidden under a veil of self-declared

innocence." Id.

Defendant argues that the interactions between Ms. Lewis and the testers is of no

moment as she was neither an "agent, employee, or representative of Edgewater Park," (Def.'s

Mem. at 9), and as such, her comments "are not attributable to defendant as a matter of law (id.).

As discussed in the Court's previous opinion, Plaintiff does not seek to hold Edgewater liable

based on the statements and actions of Ms. Lewis, but rather argues that the Co-op's three reference policy itself violates the Fair Housing Act, as well as other federal, state and city laws, under a number of theories of liability. Moreover, the fact that real estate agents communicate the rule's existence to potential buyers and Ms. Lewis' statements about how the rule is applied in Edgewater Park are evidence that the rule is an actual barrier to entry for racial minorities. See Fair Housing Justice Center, Inc.,2010 WL 3341907, at *3, *4. Defendant argues that the "factual record adduced during discovery refutes plaintiff's allegations regarding the discriminatory intent of the three-reference rule." (Def.'s Mem at 11 (emphasis omitted).) Disputed issues of material facts exist and summary judgment is not appropriate.

Defendant contends that the evidence shows that, notwithstanding the three reference rule, African-Americans have applied to and been successfully accepted into Edgewater Park. (Def.'s 56.1 ¶ 10; Def.'s Mem. at 11.) Defendant also asserts that "there is no evidence that any African-Americans applied to Edgewater Park and were rejected for failure to meet the three reference rule requirement." (Id.) However, the fact remains that Defendant has failed to identify any African-Americans living at Edgewater Park,[8] or who have successfully applied to Edgewater Park. Nevertheless, it is well settled in this circuit that no application need be filed in order to prevail on a discrimination claim. See Joint Apprenticeship Comm., 164 F.3d at 97. The issue is whether the rule has a discriminatory effect on potential applicants.

Defendant contends that Plaintiff's circumstantial evidence does not rise to the level of a finding of intentional discrimination under any of Plaintiff's intent bases claims. (Def.'s Reply

---

[8] Defendant has not identified an African-American Shareholder at Edgewater Park, despite maintaining that they exist. Defendant points to a 1998 HUD Study which stated that out of 54 applications received that year, 8 African-American applications were reviewed, and all 8 were accepted. Plaintiff points out that current census data reveals that approximately 6 of the 675 households contain someone who identifies as black or African-American. (Tr. at 5, 49.)

Mem. at 1.)  Conversely, Plaintiff claims that such circumstantial evidence exists and therefore summary judgment would be inappropriate. (Pl.'s Mem. at 19-24.)  Plaintiff cites to Edgewater Park's history of racial segregation and racial incidents which would allow a jury to infer that the three reference rule acts as a barrier to minority buyers. (Id. at 23-25; Tr. at 50-52.) Additionally, Plaintiff's point to the subjectivity of both the reasons for the rule's very existence and the application of the rule. (Id. at 20-23.)  Lastly, Plaintiff contends that when the Co-op comes into possession of a houses to sell, they "keep it in the family" by not using outside real estate agents, but rather place ads in the internal community newspaper and distribute flyers to the Edgewater Park office.[9] (Tr. at 53-54.)  Moreover, there is a factual dispute between the parties as to whether open houses are permitted at Edgewater Park, and if "for sale" signs are permitted to be placed on lawns in front of houses. (Tr. at 44, 62.)

Plaintiff points to three racial incidents as circumstantial evidence in further support of the discriminatory nature of the three reference rule.  Plaintiff notes three occasions where young adult residents of Edgewater Park hurled racial epithets at African-American and Latino security guards whose employer had contracted with the Co-op. (See Pl.'s 56.1 ¶¶ 98-100.)  During one of these incidents, an individual poured beer over the head of a guard while repeatedly directing a racial epithet at him. (Id. ¶ 100.)  Defendant explains that these incidents involved "beer drinking teenagers" whose behavior does not provide an inference of intentional discrimination regarding the three reference rule.  There is a dispute about the disciplinary action, if any, taken against the young adults or their parents for such behavior.  (Tr. at 13, 14, 51.)  Plaintiff also points to a cross-burning incident which took place in 1980 across the street from Edgewater

---

[9] Plaintiff concedes that Edgewater Park rarely comes into possession of homes to sell.  The homes that do come into its possession are usually surrendered back to the corporation on account of non-payment, etc. (Tr. at 53-54.)

17

Park. (Pl.'s 56.1 ¶ 96.)  This incident, however, took place outside of Edgewater Park and prior

to Edgewater Park becoming a Co-op.

Plaintiff argues that the unclear purpose of the three reference rule and lack of any

objective standard in the application of the rule would allow a jury to infer that the rule has been

established as a barrier to minority buyers. (Pl.'s Mem. at 20.)  Indeed, the deposed board

members have given slightly different reasons for the existence of the rule, including the

necessary goals of confirming the potential buyers financial soundness and lack of a criminal

record. (See Pl.'s 56.1 ¶¶ 49-52.)  The more troubling inconsistencies among board members

arise when determining what constitutes a good reference and who can provide such a reference.

(Id. at ¶¶ 41-45.)  Notably, there are discrepancies about whether the one-year residency

requirement to be able to provide a reference is actually adhered to, whether the individual

selling the house can provide one of the references, and whether there is any time requirement to

know the individual seeking the reference. (Id.)  Such subjective criteria and application of rules

may be used as circumstantial evidence to demonstrate an inference of discriminatory intent.

See Robinson v. 12 Lofts Realty, Inc.,  610 F.2d 1032, 1040 (2d Cir. 1979) ("In evaluating the

proposed justifications [for the alleged discriminatory act], the district court must carefully

scrutinize suggested reasons that are not objective in nature").

## C.    Plaintiff's Claim For Disparate Impact Discrimination[10]

Plaintiff also alleges that the three reference rule is discriminatory under a disparate

impact theory.  A disparate impact analysis examines whether a facially neutral policy or rule has

a different impact or effect on a particular group of people. See Huntington Branch, N.A.A.C.P.

---

[10] Plaintiff is pursuing disparate impact claims under 42 U.S.C. § 3604(a); N.Y. Exec. L. §§ 296(a)(1) and (3);
N.Y.Exec. Law § 40-c; and N.Y.C. Admin. Code §§ 8-107(5)(a)(1) and (c)(2).

v. Town of Huntington, 844 F.2d 926, 933 (2d. Cir. 1988).  "Under disparate impact analysis . . .

a prima facie case is established by showing that the challenged practice of the defendant

'actually or predictably results in racial discrimination; in other words that it has a discriminatory

effect.'" Huntington, 844 F.2d at 934 (quoting United States v. City of Black Jack, 508 F.2d

1179, 1184-85 (8th Cir. 1974)).  In a disparate impact analysis case, a plaintiff need not show

that the defendant acted with discriminatory intent, rather, discriminatory effect is sufficient. See

United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1217 (2d Cir. 1987).  In order to

demonstrate a prima facie case of disparate impact, a plaintiff must show: "(1) the occurrence of

certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on

persons of a particular type produced by the defendant's facially neutral acts or practices."

Tsombanidis, 352 F.3d at 574-75 (internal quotations and emphasis omitted).  Moreover, a

plaintiff must show that the challenged facially neutral policy, actually results in discrimination

or predictably will result in discrimination. (Id. at 575.)  Lastly, a plaintiff must demonstrate that

there exists a causal relationship between the facially neutral policy and the discriminatory

impact. See Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003.)  In the instant case, Edgewater

Park's three reference rule is the facially neutral policy being challenged.  Plaintiff is planning to

prove some of those relationships by means of expert evidence. (Pl.'s Mem. at 11-14.)

 Nevertheless, Defendant contends that Plaintiff cannot "'show a causal connection

between the facially neutral policy and the alleged discriminatory effect,' and in particular,

cannot demonstrate that the three reference rule 'has a significantly adverse or disproportionate

impact on a protected group.'" (Def.'s Mem. at 14 (quoting Tsombanidis, 352 F.3d at 575).)

Specifically, Defendant argues that none of Plaintiff's statutory claims "allow a finding of

disparate impact discrimination based merely on racial demography without proof that the rule or

policy being challenged actually causes racially disparate outcomes." (Id. at 19.)  To the contrary, a plaintiff may rely solely on statistical evidence to establish a prima facie case of disparate impact. E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus., 186 F.3d 110, 117 (2d Cir. 1999) (citing Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 656-57 (1989).  Thus, the only question that remains is establishing that the three reference rule caused the racial disparity that Plaintiff's statistics supposedly bear out.

"Because statistical analysis, by its very nature, can never scientifically prove discrimination, a disparate impact plaintiff need not prove causation to a scientific degree of certainty."  Id. (citing Bazemore v. Friday, 478 U.S. 385, 400 (1986)).  In order to prevail at a trial on a claim of disparate impact, Plaintiff must only provide statistical evidence which shows a disparity substantial enough to raise an inference of disparate impact. Id.

**The Statistical Data Presented**

The record indicates that there is a significant racial disparity in the demographics of Edgewater Park.  While Plaintiff lays out a myriad of statistics in its Rule 56.1 statement based on the report of Dr. Lance Freeman, the Court need only address a portion of them for the purposes of this motion. (See Pl.'s 56.1 ¶¶ 116-154.)[11]

1) .9% of all households (6 households out of 675) at Edgewater Park are African-American.  (Pl.'s 56.1 ¶ 176.)

2) 36.6% of homeowners in the Bronx are African-American. (Id. ¶ 140.)

3) 15.4% of homeowners in the New York City Metropolitan area are African-American. (Id. ¶ 139.)

---

[11] All statistics are taken from the report of Dr. Lance Freeman and his tabulation of 2010 census data. (See Shapiro Decl. Ex. 21.)

4) 39.1% of Co-op owners in the Bronx are African-American. (Id. ¶ 142.)

5) 14.2% of Co-op owners in the New York City Metropolitan area are African-American. (Id. ¶ 141.)

6) 35.1% of African-American households in the Bronx had an income sufficient to afford to live at Edgewater Park. (Id. ¶ 136.)

7) 14.5% of African-American households in the New York City Metropolitan area had income sufficient to afford to live at Edgewater Park. (Id. ¶ 135.)

8) The adjoining census block group to Edgewater Park contained 10.6% owner-occupied African-American households. (Id. ¶ 152.)

Defendant argues that the analysis of this statistical data is inappropriate as "Dr. Freeman incorrectly compared the black composition in Edgewater with inappropriate areas, and thus drew the wrong conclusions regarding the differences in composition." (Def.'s 56.1 ¶ 11.) Moreover, Defendant argues that the racial demography of Edgewater Park, as analyzed by its experts, is similar to other areas in the Throgs Neck section of the Bronx which do not utilize a three reference rule as a condition for housing. (Id. ¶ 12.)  Thus, there exists a material dispute as to the statistics presented and analyzed by the experts in this case.  This dispute is a typical "battle of the experts" and should properly be decided by a jury. See In re Joint Eastern & Southern Dist. Asbestos Litigation, 52 F.3d 1124, 1135 (2d Cir. 1995) ("[t]rial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts") (internal quotation marks omitted). Nonetheless, the existence of the three reference rule may provide an inference of discrimination when less than 1% of Edgewater Park residents identify as African-American.

**IV.     Conclusion**

There exists genuine issues of material fact in this case which must be adjudicated by the finder of fact.  Defendant's motion for summary judgment is denied.


IT IS SO ORDERED.

Dated:  New York, New York
        March 8, 2012

Robert P. Patterson, Jr.
U.S.D.J.

22

Copies of this order were faxed to:

*Counsel for Plaintiff:*

Diane Lee Houk
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza
20th Flr.
New York, NY 10019
(212)-763-5000
Fax: (212)-763-5001

Mariann Meier Wang
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza
20th Flr.
New York, NY 10019
212-763-5000
Fax: 212-763-5001

Adam R Pulver
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza
20th Flr.
New York, NY 10019
(212)-763-5000
Fax: (212)-763-5001

Samuel Shapiro
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza
20th Flr.
New York, NY 10019
(212)-763-5000
Fax: (212)-763-5001

*Counsel for Defendants:*

Richard P. Marin
Marin Goodman LLP
500 Mamaroneck Ave, Suite 501
Harrison, NY 10528
(212) 661-1151
Fax: (212)-661-1141

Rodrigo Armand , Jr.
Marin Goodman LLP
500 Mamaroneck Ave, Suite 501
Harrison, NY 10528
(914) 412-7314
Fax: (914) 412-7334